**Fill in this information to identify the case:**

Debtor 1 : ___Feysal Ayati-Ghaffari___

Debtor 2 : _____
(Spouse, if filing)

United States Bankruptcy Court for the: ___Eastern___ District of: ___Texas___

Case number: ___18-41997___

Official Form 410

# Proof of Claim

4/16

Read the instructions before filling out this form. Use this form to make a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

JPMorgan Chase Bank, National Association
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

[X] No.

[ ] Yes.    From Whom? _____

**3. Where should notices and payments to the Creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Chase Records Center
Name

Attn: Correspondence Mail
Mail Code LA4-5555

700  Kansas Lane
Number          Street

Monroe          LA          71203
City          State          Zip Code

Contact phone  1-866-243-5851
Contact email  _____

Where should payments to the creditor be sent? (if different)

JPMorgan Chase Bank, N.A.
Name

Mail Code: OH4-7142

3415 Vision Drive
Number          Street

Columbus          OH          43219
City          State          Zip Code

Contact phone  1-866-243-5851
Contact email  _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):
_____

**4. Does this claim amend one already filed?**

[X] No.

[ ] Yes.    Claim number on court claims registry (if known) _____    Filed On _____
mm / dd / yy

**5. Do you know if anyone else has filed a proof of claim for this claim?**

[X] No.

[ ] Yes.    Who made the earlier filing? _____

Reviewer ID: Tamar_Belcher_2018-11-07_09:25:29

Debtor Name    Feysal Ayati-Ghaffari                    Case Number (if known)    18-41997

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6.** Do you have any number you use to identify the debtor?

☐ No.

☒ Yes.  Last 4 digits of the debtor's account or any number you use to identify the debtor    4884

**7.** How much is the claim?  $ 247,359.68

Does this amount include interest or other charges?

☐ No.

☒ Yes. Attach statement itemizing interest, fees, expenses, or other Charges required by Bankruptcy Rule 3001(C)(2)(A)

**8.** What is the basis of the claim?

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.
Attach any documents supporting the claim required by Bankruptcy Rule 3001(c).
Limit disclosing information that is entitled to privacy, such as healthcare information.

Money Loaned

**9.** Is all or part of the claim secured?

☐ No.

☒ Yes.  The claim is secured by a lien on property.
Nature of property

☒ Real estate. If the claim is secured by the debtor's principal residence, file a Mortgage Proof of Claim Attachment (Official Form 410-A) with this Proof of Claim.

☐ Motor vehicle

☐ Other. Describe: _____

Basis for perfection:    Recorded Security Instrument
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of Property:    $ _____

Amount of the claim that is secured:    $ 247,359.68

Amount of the claim that is unsecured:    $ _____  (The sum of secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:    $ 110,003.82

Amount Interest Rate (When case was filed):    6.87500%
☒ Fixed
☐ Variable

**10.** Is this claim based on a lease?

☒ No.

☐ Yes.  Amount necessary to cure any default as of the date of the petition.    $ ‐

**11.** Is this claim subject to a right of setoff?

☒ No.

☐ Yes.  Identify the property: _____

Reviewer ID: Tamar_Belcher_2018-11-07_09:25:29

Debtor Name   Feysal Ayati-Ghaffari

Case Number (if known)   18-41997

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | X | No | | |
|---|---|---|---|---|---|

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

Yes. Check that all apply.

Amount entitled to priority

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).   $_____

☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).   $_____

☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).   $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(5).   $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).   $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.   $_____

\* Amounts are subject to adjustment on 4/1/19 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:   Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571.

Check the appropriate boxes:

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   _11-13-2018_
                   MM / DD / YYYY

Signature   _[signature]_

Print the name of the person who is completing and signing this claim:

Name   _Jason_____Arthur_____Cornill_
       First Name        Middle Name        Last Name

Title   **Authorized Agent for JPMorgan Chase Bank, National Association**

Company   **Bonial & Associates, P.C.**
          Identify the corporate servicer as the company if the authorized agent is a servicer.

Address   **P.O. Box 9013**
          Number        Street

**Addison**        **Texas**        **75001**
City               State            Zip Code

Contact Phone   **(972) 643-6600**   Email   **POCInquiries@BonialPC.com**

---

Reviewer ID: Tamar_Belcher_2018-11-07_09:25:29

Reviewer ID: Tamar_Belcher_2018-11-07_09:25:29

# Mortgage Proof of Claim Attachment

If you file a claim secured by a security interest in the debtor's principal residence, you must use this form as an attachment to your proof of claim. See separate instructions.

**Part 1: Mortgage and Case Information**

| | |
|---|---|
| Case number: | 18-41997 |
| Debtor 1: | Feysal Ayeil-Ghaltari |
| Debtor 2: | |
| Last 4 digits to identify: | 4884 |
| Creditor: | JPMorgan Chase Bank, National Association |
| Servicer: | JPMorgan Chase Bank, N.A. |
| Fixed accrual/daily simple interest/other: | Fixed |

| | |
|---|---|
| Case Number: | 18-41997 |
| Debtor 1: | Feysal Ayeil-Ghaltari |

**Part 2: Total Debt Calculation**

| | |
|---|---|
| Principal Balance | $154,912.93 |
| Deferred Balance | $0.00 |
| Interest due | $58,719.21 |
| Fees, costs due | $2,415.00 |
| Escrow deficiency for funds | $31,557.05 |
| Less total funds on hand | $245.51 |
| Total debt | $247,359.68 |

**Part 3: Arrearage as of Date of the Petition**

| | |
|---|---|
| Principal & interest due | $70,672.80 |
| Prepetition fees due | $2,415.00 |
| Escrow deficiency for funds advanced | $31,557.05 |
| Projected escrow shortage | |
| Less funds on hand | $3,603.48 |
| Post-petition payments included in arrearage | $245.51 |
| Amount Waived Post-petition | |
| Amount per Court Order | |
| Total prepetition arrearage | $110,003.82 |

**Part 4: Monthly Mortgage Payment**

| | |
|---|---|
| Principal & interest | $1,070.80 |
| Monthly escrow | $700.51 |
| Private mortgage insurance | $0.00 |
| Total monthly payment | $1,771.31 |

**Part 5: Loan Payment History from First Date of Default**

| A. Date | B. Contractual Payment Amount | C. Funds Received | D. Amount Incurred | E. Description | F. Contractual Due Date | G. Prin, Int & esc past due balance | H. Amount to principal | I. Amount to interest | J. Amount to escrow | K. Amount to fees or charges | L. Unapplied funds | M. Principal balance | N. Accrued interest balance | O. Escrow balance | P. Fees / Charges balance | Q. Unapplied funds balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01/01/2013 | $1,070.80 | | | PAYMENT DUE | | $0.00 | | | | | | $155,456.52 | | $0.00 | $0.00 | $29.25 |
| 01/01/2013 | | $1,070.80 | | PAYMENT APPLIED | 01/01/2013 | $1,070.80 | $180.16 | $890.64 | | | | $155,456.52 | | $0.00 | $0.00 | $29.25 |
| 02/01/2013 | $1,070.80 | | | PAYMENT DUE | | $0.00 | | | | | | $155,276.36 | | $0.00 | $0.00 | $29.25 |
| 02/01/2013 | | $1,070.80 | | PAYMENT APPLIED | 02/01/2013 | $1,070.80 | $181.20 | $889.60 | | | | $155,276.36 | | $0.00 | $0.00 | $29.25 |
| 03/01/2013 | $1,070.80 | | | PAYMENT DUE | | $2,141.60 | | | | | | $155,276.36 | | $0.00 | $0.00 | $29.25 |
| 03/01/2013 | | | | PAYMENT APPLIED | 03/01/2013 | $1,070.80 | $182.23 | $888.57 | | | | $155,095.16 | | $0.00 | $0.00 | $0.00 |
| 04/01/2013 | $1,070.80 | | | PAYMENT DUE | | $2,141.60 | | | | | $(29.25) | $154,912.93 | | $0.00 | $0.00 | $244.51 |
| 05/01/2013 | $1,070.80 | | | PAYMENT DUE | | $3,212.40 | | | | | | $154,912.93 | | $0.00 | $0.00 | $244.51 |
| 06/01/2013 | $1,070.80 | | | PAYMENT DUE | | $4,283.20 | | | | | | $154,912.93 | | $0.00 | $0.00 | $244.51 |
| 07/01/2013 | $1,070.80 | | | PAYMENT DUE | | $5,354.00 | | | | | | $154,912.93 | | $0.00 | $0.00 | $244.51 |
| 08/01/2013 | $1,070.80 | | | PAYMENT DUE | | $6,424.80 | | | | | | $154,912.93 | | $0.00 | $0.00 | $244.51 |
| 08/26/2013 | | $78.00 | $78.00 | BPO | | $6,424.80 | | | | | | $154,912.93 | | $0.00 | $78.00 | $244.51 |
| 09/01/2013 | $1,070.80 | | | PAYMENT DUE | | $7,495.60 | | | | | | $154,912.93 | | $0.00 | $78.00 | $244.51 |
| 09/01/2013 | | $2,386.11 | | DISBURSEMENT TO MORTGAGOR | | $8,566.40 | | | $(631.32) | | | $154,912.93 | | $0.00 | $78.00 | $244.51 |
| 10/01/2013 | $1,070.80 | | | PAYMENT DUE | | $9,637.20 | | | | | | $154,912.93 | | $0.00 | $78.00 | $244.51 |
| 11/01/2013 | $1,070.80 | | | PAYMENT DUE | | $10,708.00 | | | | | | $154,912.93 | | $0.00 | $78.00 | $244.51 |
| 12/01/2013 | $1,070.80 | | | PAYMENT DUE | | $11,778.80 | | | | | | $154,912.93 | | $0.00 | $78.00 | $244.51 |
| 01/01/2014 | $1,070.80 | | | PAYMENT DUE | | $12,849.60 | | | | | | $154,912.93 | | $0.00 | $78.00 | $244.51 |
| 02/01/2014 | $1,070.80 | | | PAYMENT DUE | | $13,920.40 | | | | | | $154,912.93 | | $0.00 | $78.00 | $244.51 |
| 03/01/2014 | $1,070.80 | | | PAYMENT DUE | | $14,991.20 | | | | | | $154,912.93 | | $0.00 | $78.00 | $244.51 |
| 04/01/2014 | $1,070.80 | | | PAYMENT DUE | | $16,062.00 | | | | | | $154,912.93 | | $0.00 | $78.00 | $244.51 |
| 05/01/2014 | $1,070.80 | | | PAYMENT DUE | | $16,062.00 | | | | | | $154,912.93 | | $0.00 | $78.00 | $244.51 |
| 06/01/2014 | $1,070.80 | | | PAYMENT DUE | | $16,062.00 | | | | | | $154,912.93 | | $0.00 | $78.00 | $244.51 |
| 06/02/2014 | | | $78.00 | BPO | | $16,062.00 | | | | | | $154,912.93 | | $4,840.03 | $156.00 | $244.51 |
| 07/01/2014 | $1,070.80 | | | PAYMENT DUE | | $17,132.80 | | | $(4,208.71) | | | $154,912.93 | | $4,840.03 | $156.00 | $244.51 |
| 08/01/2014 | $1,070.80 | | | PAYMENT DUE | | $18,203.60 | | | | | | $154,912.93 | | $4,840.03 | $156.00 | $244.51 |
| 08/05/2014 | | $78.00 | | SPECIAL ESCROW DEPOSIT | | $18,203.60 | | | $84.20 | | | $154,912.93 | | $4,755.83 | $156.00 | $244.51 |
| 09/01/2014 | $1,070.80 | | | PAYMENT DUE | | $19,274.40 | | | | | | $154,912.93 | | $4,755.83 | $156.00 | $244.51 |
| 09/08/2014 | | $78.00 | | BPO | | $19,274.40 | | | | | | $154,912.93 | | $4,755.83 | $156.00 | $244.51 |
| 10/01/2014 | $1,070.80 | | | PAYMENT DUE | | $20,345.20 | | | | | | $154,912.93 | | $4,755.83 | $156.00 | $244.51 |
| 10/01/2014 | | | | PAYMENT DUE | | $21,416.00 | | | | | | $154,912.93 | | $8,361.53 | $156.00 | $244.51 |
| 11/01/2014 | $1,070.80 | | | PAYMENT DUE | | $21,416.00 | | | | | | $154,912.93 | | $8,361.53 | $156.00 | $244.51 |
| 11/17/2014 | | $78.00 | | PAYMENT DUE | | $22,486.80 | | | | | | $154,912.93 | | $8,361.53 | $156.00 | $244.51 |
| 12/01/2014 | $1,070.80 | | | DELINQUENT BASE TAX | | $23,557.60 | | | $(3,605.70) | | | $154,912.93 | | $8,361.53 | $156.00 | $244.51 |
| 01/01/2015 | $1,070.80 | | | PAYMENT DUE | | $24,628.40 | | | | | | $154,912.93 | | $8,361.53 | $156.00 | $244.51 |
| 02/01/2015 | $1,070.80 | | | PAYMENT DUE | | $25,699.20 | | | | | | $154,912.93 | | $8,361.53 | $156.00 | $244.51 |
| 03/01/2015 | $1,070.80 | | | SPECIAL ESCROW | | $25,699.20 | | | | | | $154,912.93 | | $8,361.53 | $156.00 | $244.51 |
| 04/01/2015 | $1,070.80 | | | PAYMENT DUE | | $26,770.00 | | | | | | $154,912.93 | | $8,361.53 | $234.00 | $244.51 |
| 04/01/2015 | | $78.00 | | BPO | | $27,840.80 | | | | | | $154,912.93 | | $8,361.53 | $234.00 | $244.51 |
| 05/01/2015 | $1,070.80 | | | PAYMENT DUE | | $28,911.60 | | | | | | $154,912.93 | | $8,361.53 | $234.00 | $244.51 |
| 06/01/2015 | $1,070.80 | | | PAYMENT DUE | | $29,982.40 | | | | | | $154,912.93 | | $8,361.53 | $234.00 | $244.51 |
| 07/01/2015 | $1,070.80 | | | PAYMENT DUE | | $31,053.20 | | | | | | $154,912.93 | | $8,361.53 | $234.00 | $244.51 |
| 08/01/2015 | $1,070.80 | | | PAYMENT DUE | | $32,124.00 | | | | | | $154,912.93 | | $8,361.53 | $234.00 | $244.51 |
| 09/01/2015 | $1,070.80 | | | PAYMENT DUE | | $33,194.80 | | | | | | $154,912.93 | | $8,361.53 | $234.00 | $244.51 |
| 10/01/2015 | $1,070.80 | | | PAYMENT DUE | | $34,265.60 | | | | | | $154,912.93 | | $8,361.53 | $234.00 | $244.51 |
| 11/01/2015 | $1,070.80 | | | COUNTY TAX | | $34,265.60 | | | $(4,761.63) | | | $154,912.93 | | $13,123.16 | $234.00 | $244.51 |
| 11/02/2015 | | $78.00 | | BPO | | $35,336.40 | | | | | | $154,912.93 | | $13,123.16 | $234.00 | $244.51 |
| 12/01/2015 | $1,070.80 | | | PAYMENT DUE | | $35,336.40 | | | | | | $154,912.93 | | $13,123.16 | $234.00 | $244.51 |

# Mortgage Proof of Claim Attachment: Additional Page

(04/16)

| Date | Payment | Fee/Charge | Description | Balance | Disbursement | Total Debt | Escrow Bal. | Charge Bal. | Amount |
|---|---|---|---|---|---|---|---|---|---|
| 01/01/2016 | $1,070.80 | | PAYMENT DUE | $36,407.20 | | | | | $244.51 |
| 02/01/2016 | $1,070.80 | | PAYMENT DUE | $37,478.00 | | | | | $244.51 |
| 03/01/2016 | $1,070.80 | | PAYMENT DUE | $38,548.80 | | | | | $244.51 |
| 03/16/2016 | | $78.00 | BPO | $38,548.80 | | | | | $244.51 |
| 04/01/2016 | $1,070.81 | | PAYMENT DUE | $39,619.61 | | | | | $244.51 |
| 04/16/2016 | | $53.54 | LATE CHARGE - ASSESSED | $39,619.61 | | | | | $244.51 |
| 05/01/2016 | $1,070.81 | | PAYMENT DUE | $40,690.42 | | | | | $244.51 |
| 05/16/2016 | | $53.54 | LATE CHARGE - ASSESSED | $40,690.42 | | | | | $244.51 |
| 06/01/2016 | $1,070.81 | | PAYMENT DUE | $41,761.23 | | | | | $244.51 |
| 06/16/2016 | | $53.54 | LATE CHARGE - ASSESSED | $41,761.23 | | | | | $244.51 |
| 07/01/2016 | $1,070.81 | | PAYMENT DUE | $42,832.04 | | | | | $244.51 |
| 07/16/2016 | | $53.54 | LATE CHARGE - ASSESSED | $42,832.04 | | | | | $244.51 |
| 08/01/2016 | $1,070.81 | | PAYMENT DUE | $43,902.85 | | $154,912.93 | $13,123.16 | $234.00 | $244.51 |
| 08/16/2016 | | $53.54 | LATE CHARGE - ASSESSED | $43,902.85 | | $154,912.93 | $13,123.16 | $234.00 | $244.51 |
| 09/01/2016 | $1,070.81 | | PAYMENT DUE | $44,973.66 | | $154,912.93 | $13,123.16 | $234.00 | $244.51 |
| 09/16/2016 | | $53.54 | LATE CHARGE - ASSESSED | $44,973.66 | | $154,912.93 | $13,123.16 | $312.00 | $244.51 |
| 10/01/2016 | $1,070.81 | | PAYMENT DUE | $46,044.47 | | $154,912.93 | $13,123.16 | $312.00 | $244.51 |
| 10/15/2016 | | | HOMEOWNERS INSURANCE | $46,044.47 | | $154,912.93 | $13,123.16 | $312.00 | $244.51 |
| 10/17/2016 | | | HOMEOWNERS INSURANCE | $46,044.47 | $2,377.00 | $154,912.93 | $15,500.16 | $312.00 | $244.51 |
| 10/24/2016 | | $(428.32) | LATE CHARGE - WAIVED | $46,044.47 | | $154,912.93 | $15,500.16 | $579.70 | $244.51 |
| 11/01/2016 | $1,070.81 | | PAYMENT DUE | $47,115.28 | | $154,912.93 | $15,500.16 | $312.00 | $244.51 |
| 12/01/2016 | $1,070.81 | | PAYMENT DUE | $48,186.10 | | $154,912.93 | $15,500.16 | $312.00 | $244.51 |
| 12/20/2016 | | $53.54 | LATE CHARGE - ASSESSED | $48,186.10 | | $154,912.93 | $15,500.16 | $312.00 | $244.51 |
| 01/01/2017 | $1,070.82 | | PAYMENT DUE | $49,256.92 | | $154,912.93 | $20,940.51 | $312.00 | $244.51 |
| 01/24/2017 | | $53.54 | LATE CHARGE - ASSESSED | $49,256.92 | | $154,912.93 | $23,151.51 | $365.54 | $244.51 |
| 02/01/2017 | $1,070.82 | | PAYMENT DUE | $50,327.74 | | $154,912.93 | $23,151.51 | $312.00 | $244.51 |
| 02/16/2017 | | $53.54 | LATE CHARGE - ASSESSED | $50,327.74 | | $154,912.93 | $23,151.51 | $365.54 | $244.51 |
| 03/01/2017 | $1,070.82 | | PAYMENT DUE | $51,398.56 | | $154,912.93 | $23,151.51 | $419.08 | $244.51 |
| 03/16/2017 | | $53.54 | LATE CHARGE - ASSESSED | $51,398.56 | | $154,912.93 | $23,151.51 | $365.54 | $244.51 |
| 04/01/2017 | $1,070.82 | | PAYMENT DUE | $52,469.38 | | $154,912.93 | $23,151.51 | $419.08 | $244.51 |
| 04/17/2017 | | $53.54 | LATE CHARGE - ASSESSED | $52,469.38 | | $154,912.93 | $23,151.51 | $472.62 | $244.51 |
| 05/01/2017 | $1,070.82 | | PAYMENT DUE | $53,540.20 | | $154,912.93 | $23,151.51 | $526.16 | $244.51 |
| 05/16/2017 | | $53.54 | LATE CHARGE - ASSESSED | $53,540.20 | | $154,912.93 | $23,151.51 | $472.62 | $244.51 |
| 06/01/2017 | $1,070.82 | | PAYMENT DUE | $54,611.02 | | $154,912.93 | $23,151.51 | $526.16 | $244.51 |
| 06/16/2017 | | $53.54 | LATE CHARGE - ASSESSED | $54,611.02 | | $154,912.93 | $23,151.51 | $579.70 | $244.51 |
| 06/30/2017 | | | INTEREST ON ESCROW DEPOSIT | $54,611.02 | $0.10 | $154,912.93 | $23,151.41 | $579.70 | $244.51 |
| 07/01/2017 | $1,070.82 | | PAYMENT DUE | $55,681.84 | | $154,912.93 | $23,151.41 | $579.70 | $244.51 |
| 07/17/2017 | | $53.54 | LATE CHARGE - ASSESSED | $55,681.84 | | $154,912.93 | $23,151.41 | $633.24 | $244.51 |
| 08/01/2017 | $1,070.82 | | PAYMENT DUE | $56,752.66 | | $154,912.93 | $23,151.41 | $579.70 | $244.51 |
| 08/16/2017 | | $53.54 | LATE CHARGE - ASSESSED | $56,752.66 | | $154,912.93 | $23,151.41 | $633.24 | $244.51 |
| 09/01/2017 | $1,070.82 | | PAYMENT DUE | $57,823.48 | | $154,912.93 | $23,151.41 | $686.78 | $244.51 |
| 09/16/2017 | | | COUNTY TAX | $57,823.48 | $6,127.04 | $154,912.93 | $29,278.05 | $686.78 | $244.51 |
| 10/01/2017 | $1,070.82 | | PAYMENT DUE | $58,894.30 | | $154,912.93 | $29,278.05 | $686.78 | $244.51 |
| 11/01/2017 | $1,070.82 | | PAYMENT DUE | $59,965.12 | | $154,912.93 | $29,278.05 | $686.78 | $244.51 |
| 11/20/2017 | | $53.54 | LATE CHARGE - ASSESSED | $59,965.12 | | $154,912.93 | $29,278.05 | $686.78 | $244.51 |
| 12/01/2017 | $1,070.82 | | PAYMENT DUE | $61,035.94 | | $154,912.93 | $29,278.05 | $686.78 | $244.51 |
| 01/01/2018 | $1,070.82 | | PAYMENT DUE | $62,106.76 | | $154,912.93 | $29,278.05 | $686.78 | $244.51 |
| 01/26/2018 | | $53.54 | LATE CHARGE - ASSESSED | $62,106.76 | | $154,912.93 | $29,278.05 | $686.78 | $244.51 |
| 02/01/2018 | $1,070.82 | | PAYMENT DUE | $63,177.58 | | $154,912.93 | $31,557.05 | $686.78 | $244.51 |
| 02/16/2018 | | | COUNTY TAX | $64,248.40 | $0.40 | $154,912.93 | $31,557.05 | $686.78 | $244.51 |
| 03/01/2018 | $1,070.82 | | PAYMENT DUE | $64,248.40 | $2,279.00 | $154,912.93 | $31,557.05 | $686.78 | $244.51 |
| 03/03/2018 | | $78.00 | BPO | $65,319.22 | | $154,912.93 | $31,557.05 | $794.78 | $244.51 |
| 04/01/2018 | $1,070.82 | | PAYMENT DUE | $66,390.04 | | $154,912.93 | $31,557.05 | $794.78 | $244.51 |
| 05/01/2018 | $1,070.82 | | PAYMENT DUE | $67,460.86 | | $154,912.93 | $31,557.05 | $794.78 | $244.51 |
| 05/03/2018 | | $53.54 | LATE CHARGE - ASSESSED | | | $154,912.93 | $31,557.05 | $794.78 | $244.51 |
| 06/01/2018 | $1,070.82 | | PAYMENT DUE | | | $154,912.93 | $31,557.05 | $794.78 | $244.51 |

Reviewer ID: Tamar_Belcher_2018-11-07_09-25-29

# Mortgage Proof of Claim Attachment: Additional Page

(04/16)

| Date | Amount | Fee | Description | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 07/01/2018 | $1,070.82 | | PAYMENT DUE | $88,531.88 | | | $154,912.93 | $31,557.05 | $784.78 | $244.51 |
| 08/01/2018 | $1,070.82 | | PAYMENT DUE | $69,602.50 | | | $154,912.93 | $31,557.05 | $784.78 | $244.51 |
| 08/02/2018 | | $215.00 | TITLE FEES | $69,602.50 | | | $154,912.93 | $31,557.05 | $979.78 | $244.51 |
| 08/02/2018 | | $487.50 | FC ATTY FEE | $69,602.50 | | | $154,912.93 | $31,500.05 | $1,467.28 | $244.51 |
| 08/04/2018 | | $1.41 | FCL MAIL | $69,602.50 | | | $154,912.93 | $31,557.05 | $1,468.69 | $244.51 |
| 09/14/2018 | | $3.90 | FCL SALE COST | $69,602.50 | | | $154,912.93 | $31,557.05 | $1,468.69 | $244.51 |
| 09/14/2018 | | $26.00 | FCL SALE COST | $69,602.50 | | | $154,912.93 | $31,557.05 | $1,471.69 | $244.51 |
| 08/14/2018 | | $869.75 | FC ATTY FEE | $69,602.50 | | | $154,912.93 | $31,557.05 | $1,407.69 | $244.51 |
| 09/15/2018 | | $21.68 | FCL MAIL | $69,602.50 | | | $154,912.93 | $31,557.05 | $2,391.44 | $244.51 |
| 09/15/2018 | | $1.88 | FCL MAIL | $69,602.50 | | | $154,912.93 | $31,557.05 | $2,413.12 | $244.51 |
| 08/15/2018 | $1,070.82 | | PAYMENT DUE | $70,673.32 | | | $154,912.93 | $31,557.05 | $2,415.00 | $244.51 |
| **09/01/2018** | | | BK FILED DATE | $70,673.32 | | | $154,912.93 | $31,557.05 | $2,415.00 | $244.51 |

Reviewer ID: Tamar_Belcher_2018-11-07_09:25:29

Servicer Loan #              4884
Borrower Name               Feysal Ayati-Ghaffari
BK Case Number              18-41997

Interest Rate               6.875%
1st Principal Balance        $154,912.93
Escrow Balance              $(31,557.05)
Suspense Balance            $244.51

| Transaction Description | Transaction Code | Transaction Date | Ins Premium Disb Due Date | Escrow Amount | Escrow Disbursement | Escrow Balance |
|---|---|---|---|---|---|---|
| Payment Application | 160 | 09/30/2017 | 09/30/2017 | $0.40 | | $(23,151.01) |
| Disb. for COUNTY TAX | 312 | 11/30/2017 | 11/30/2017 | | $(6,127.04) | $(29,278.05) |
| Disb. for HOMEOWNERS INSURANCE | 351 | 01/26/2018 | 01/26/2018 | | $(2,279.00) | $(31,557.05) |
| | | | | | | $(31,557.05) |

Reviewer ID: Tamar_Belcher_2018-11-07_09:25:29

Part 3 of form B410A requires Chase to calculate the prepetition escrow deficiency for funds advanced and the projected escrow shortage separately from the principal and interest (P&I) portion of all monthly installments that remain unpaid as of the petition date. In order to make this calculation, Chase adjusts its system to reduce the escrow portion of the monthly installment payment to $0.01 for each escrow advance type. For example, where the unpaid monthly installment payments were $1,200 ($800 P&I, $300 taxes, $100 insurance) prior to bankruptcy, the unpaid monthly installment payments will be reduced to $800.02 ($800 P&I, $0.01 taxes, $0.01 insurance). Please note that to the extent that Private Mortgage Insurance ("PMI") is contained within the monthly installment payment, it is also reduced to a penny in this process.

Because the adjustment process occurs before part 5 of form B410A is completed, any unpaid monthly installment payments listed in column B (and the past due balance in Column G) will be listed at the reduced amount rather than the contractual payment amount listed in monthly statements received prior to bankruptcy.

Monthly installment payments listed on part 5 that were paid prior to the petition date include the full pre-petition escrow payment because those payments were made and applied prior to the reduction of the escrow payment. In the example provided, paid monthly installments in part 5 would be listed at $1,200. Unpaid monthly installments listed in part 5 would be listed at $800.02. The debtor's post-petition escrow payment is also not impacted by this process and is set forth in Part 4 of form B410A.

## CERTIFICATE OF SERVICE PROOF OF CLAIM

I hereby certify that a true and correct copy of the foregoing document has been served upon the following parties in interest on or before __November 13__ 20__18__ via electronic notice unless otherwise stated:

**Debtor**          *Via U.S. Mail*
Feysal Ayati-Ghaffari
2301 All Saints Ln.
Plano, TX 75025-5537

**Debtors' Attorney**
Weldon Reed Allmand
Attorney at Law
860 Airport Freeway Suite 401
Hurst, TX  76054

**Chapter 13 Trustee**
Carey D. Ebert
P.O. Box 941166
Plano, Texas 75094-1166

Respectfully Submitted,

Jason A. Cottrill

STATE OF LOUISIANA

PARISH OF OUACHITA

## AFFIDAVIT OF LOST NOTE

Loan Number: ███████████

Borrower's Name:  Feysal Ayati-Ghaffari

I, Jana Whitman, the undersigned, being duly sworn, state as follows:

1.  I am a Vice President of JPMorgan Chase Bank, N.A. ("Chase").

2.  Chase is the custodian of the collateral documents described in paragraph 4 below (the "Loan"). Chase is the party seeking to enforce the note described below.

3.  I have access to certain of Chase's business records, including the business records of Chase and JPMorgan Chase Custody Services, Inc., a subsidiary of Chase, concerning the Loan. These records are maintained by Chase in the ordinary course of its regularly conducted business activities and are made at or near the time of the event, by or from information transmitted by a person with knowledge. It is the regular practice to keep such records in the ordinary course of a regularly conducted business activity. I make this affidavit based upon my review of those records.

4.  A note dated November 3, 2008, in the original principal amount of $163,000.00, with an original interest rate of 6.875% per annum, providing for initial monthly payments in the amount of $1,070.80, was executed by Feysal Ayati-Ghaffari, and secured by a Deed of Trust dated November 3, 2008 and recorded in the office of the County Clerk of Collin County, Texas in Book N/A at Page N/A or as Instrument no. 20081119001345840.

5.  Chase's regular business practice is to store original notes secured by mortgages and deeds of trust in collateral files maintained by Chase's agent, JPMorgan Chase Custody Services, Inc., in a secure vault facility in Monroe, Louisiana. After a thorough and diligent manual search of the hard copy collateral file pertaining to the loan, which contains other documents maintained by Chase concerning the Loan, the original note was not located.

6.  The business records described above reflect that the note was in JP Morgan Chase Custody Services, Inc.'s possession at the time it was lost or destroyed.

LNA-093012v3

Loan Number: ███████

Borrower's Name: Feysal Ayati-Ghaffari

7. The loss of possession is not the result of the original note being canceled or transferred to another party.

8. A copy of the original note is attached hereto.

JPMorgan Chase Bank, NA

By: *Jana Whitman*

Name: Jana Whitman

Title: Vice President

Date: March 4, 2014

Subscribed and sworn to before me this 4th day of March, 2014, by Jana Whitman.

*Katharine Johnson* — 68375

KATHARINE JOHNSON

Notary Public

State of Louisiana

My commission expires: Lifetime commission

Personally known _____✓_____ OR

Produced identification _____

Type of identification produced: NA

LNA-093012v3

Loan Number: ███████████

Borrower's Name: Feysal Ayati-Ghaffari

## Attachment 1

(Copy of Note)

LNA-093012v3

Reviewer ID: Tamar_Belcher_2018-11-07_09:25:29

**NOTE**

MIN
MERS Telephone: (888) 679-6377 ████████

November 3, 2008
[Date]

████████ Dallas ████████                           TX
[City]                                              [State]

4508 Lone Grove Ln
Plano, TX 75093-5508
[Property Address]



## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $163,000.00      (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is Freedom Mortgage Corporation

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of        6.875 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the    1st    day of each month beginning on January 1, 2009         . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on December 1, 2038         , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 8068, Virginia Beach, VA  23450-8068
or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $   1,070.80      .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

████████

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Amended for Texas

████ -5N(TX) (0811)           Form 3200 1/01
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3                   Initials: *FA*

████████



Reviewer ID: Tamar_Belcher_2018-11-07_09:25:29

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of            15            calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be            5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

Reviewer ID: Tamar_Belcher 2018 11 07 09:25:29

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_Feysal Ayati - G-Raffari   11/7/2008_
_____ (Seal)      _____ (Seal)
Feysal Ayati-Ghaffari               -Borrower                                  -Borrower

_____ (Seal)      _____ (Seal)
                                   -Borrower                                  -Borrower

_____ (Seal)      _____ (Seal)
                                   -Borrower                                  -Borrower

_____ (Seal)      _____ (Seal)
                                   -Borrower                                  -Borrower

Pay to the order of _____ without
recourse this ____ day of __ 20__
Freedom Mortgage Corporation

Stan Moskowitz/cpa
Treasurer/Chief Financial Officer

[Sign Original Only]

-5N(TX) (0011)                        Page 3 of 3                        Form 3200 1/01



FTIITAS

FHLMC

20081119001345840   11/19/2008 10:38:47 AM DT  1/18

Return To:
Freedom Mortgage
Attn: Final Documents
P.O. Box 8001
Fishers, IN 46038-8001

Prepared By:

~FHLMC

———————————— [Space Above This Line For Recording Data] ————————————

# DEED OF TRUST
### MIN

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON,
YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING
INFORMATION FROM ANY INSTRUMENT THAT·TRANSFERS AN INTEREST
IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC
RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE
NUMBER.

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated November 3, 2008
together with all Riders to this document.

(B) "Borrower" is Feysal  Ayati-Ghaffari and Irana Haghnazari, husband and
wife.

Borrower is the grantor under this Security Instrument.

(C) "Lender" is Freedom Mortgage Corporation

TEXAS-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3044  1/01

Wolters Kluwer Financial Services
VMP®-6A(TX) (0704)

Page 1 of 16                    Initials: FA
                                          GH



Lender is a  Corporation
organized and existing under the laws of The State of New Jersey
Lender's address is 907 Pleasant Valley Av Ste 3, Mount Laurel, NJ  08054

Lender includes any holder of the Note who is entitled to receive payments under the Note.
(D) "Trustee" is Calvin C. Mann, Jr.

. Trustee's address is

4900 Woodway Drive, Suite 650, Houston, TX  77056

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. MERS is a beneficiary under
this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated November 3, 2008
The Note states that Borrower owes Lender One Hundred Sixty Three Thousand and
00/100
                                                                                                        Dollars
(U.S. $163,000.00           ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than December 1, 2038
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☒ Other(s) [specify] |
| | | Renewal and Extension Rider |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.

VMP®-6A(TX) (0709)                              Page 2 of 16                    Initials: FA                 Form 3044   1/01
                                                                                        9H

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County                                    of Collin                                    :

       [Type of Recording Jurisdiction]                                    [Name of Recording Jurisdiction]

Lot 2, Block 18, of PRESTONDALE, an Addition to the City of Plano, Collin County, Texas, according to the Map or Plat thereof recorded in Volume C, Page 726, of the Map Records of Collin County, Texas.

Parcel ID Number: R145001800201                              which currently has the address of
4508 Lone Grove Ln                                                                        [Street]
Plano                                                       [City], Texas 75093-5508        [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this

VMP ®-6A(TX) (0704)                          Page 3 of 16          Initials: _FA_          Form 3044  1/01

Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

Reviewer ID: Tamar Belcher_2018-11-07_09:25:29

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any

Initials: FA
9 H

interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.



12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually

Initials: FA

received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan

Initials: *FA*

*JW*

Form 3044   1/01

servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Initials: FA

YH

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice will result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence. For the purposes of this Section 22, the term "Lender" includes any holder of the Note who is entitled to receive payments under the Note.

If Lender invokes the power of sale, Lender or Trustee shall give notice of the time, place and terms of sale by posting and filing the notice at least 21 days prior to sale as provided by Applicable Law. Lender shall mail a copy of the notice to Borrower in the manner prescribed by Applicable Law. Sale shall be made at public venue. The sale must begin at the time stated in the notice of sale or not later than three hours after that time and between the hours of 10 a.m. and 4 p.m. on the first Tuesday of the month. Borrower authorizes Trustee to sell the property to the highest bidder for cash in one or more parcels and in any order Trustee determines. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying indefeasible title to the Property with covenants of general warranty from Borrower. Borrower covenants and agrees to defend generally the purchaser's title to the Property against all claims and demands. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

If the Property is sold pursuant to this Section 22, Borrower or any person holding possession of the Property through Borrower shall immediately surrender possession of the Property to the purchaser at that sale. If possession is not surrendered, Borrower or such person shall be a tenant at sufferance and may be removed by writ of possession or other court proceeding.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall provide a release of this Security Instrument to Borrower or Borrower's designated agent in accordance with Applicable Law. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee; Trustee Liability. All rights, remedies and duties of Trustee under this Security Instrument may be exercised or performed by one or more trustees acting alone or together. Lender, at its option and with or without cause, may from time to time, by power of attorney or otherwise, remove or substitute any trustee, add one or more trustees, or appoint a successor trustee to any Trustee without the necessity of any formality other than a designation by Lender in writing. Without any further act or conveyance of the Property the substitute, additional or successor trustee shall become vested with the title, rights, remedies, powers and duties conferred upon Trustee herein and by Applicable Law.

Initials: _FA_

_YH_

Reviewer ID: Tamar_Belcher_2018-11-07_09:25:29

Trustee shall not be liable if acting upon any notice, request, consent, demand, statement or other document believed by Trustee to be correct. Trustee shall not be liable for any act or omission unless such act or omission is willful.

25. Subrogation. Any of the proceeds of the Note used to take up outstanding liens against all or any part of the Property have been advanced by Lender at Borrower's request and upon Borrower's representation that such amounts are due and are secured by valid liens against the Property. Lender shall be subrogated to any and all rights, superior titles, liens and equities owned or claimed by any owner or holder of any outstanding liens and debts, regardless of whether said liens or debts are acquired by Lender by assignment or are released by the holder thereof upon payment.

26. Partial Invalidity. In the event any portion of the sums intended to be secured by this Security Instrument cannot be lawfully secured hereby, payments in reduction of such sums shall be applied first to those portions not secured hereby.

27. Purchase Money; Owelty of Partition; Renewal and Extension of Liens Against Homestead Property; Acknowledgment of Cash Advanced Against Non-Homestead Property. Check box as applicable:

☐ Purchase Money.
The funds advanced to Borrower under the Note were used to pay all or part of the purchase price of the Property. The Note also is primarily secured by the vendor's lien retained in the deed of even date with this Security Instrument conveying the Property to Borrower, which vendor's lien has been assigned to Lender, this Security Instrument being additional security for such vendor's lien.

☐ Owelty of Partition.
The Note represents funds advanced by Lender at the special instance and request of Borrower for the purpose of acquiring the entire fee simple title to the Property and the existence of an owelty of partition imposed against the entirety of the Property by a court order or by a written agreement of the parties to the partition to secure the payment of the Note is expressly acknowledged, confessed and granted.

☒ Renewal and Extension of Liens Against Homestead Property.
The Note is in renewal and extension, but not in extinguishment, of the indebtedness described on the attached Renewal and Extension Exhibit which is incorporated by reference. Lender is expressly subrogated to all rights, liens and remedies securing the original holder of a note evidencing Borrower's indebtedness and the original liens securing the indebtedness are renewed and extended to the date of maturity of the Note in renewal and extension of the indebtedness.

☐ Acknowledgment of Cash Advanced Against Non-Homestead Property.
The Note represents funds advanced to Borrower on this day at Borrower's request and Borrower acknowledges receipt of such funds. Borrower states that Borrower does not now and does not intend ever to reside on, use in any manner, or claim the Property secured by this Security Instrument as a business or residential homestead. Borrower disclaims all homestead rights, interests and exemptions related to the Property.

28. Loan Not a Home Equity Loan. The Loan evidenced by the Note is not an extension of credit as defined by Section 50(a)(6) or Section 50(a)(7), Article XVI, of the Texas Constitution. If the Property is used as Borrower's residence, then Borrower agrees that Borrower will receive no cash from the Loan evidenced by the Note and that any advances not necessary to purchase the Property, extinguish an owelty lien, complete construction, or renew and extend a prior lien against the

Initials: 

Reviewer ID: Tamer Belcher 2018-11-07 09:25:29

Property, will be used to reduce the balance evidenced by the Note or such Loan will be modified to evidence the correct Loan balance, at Lender's option. Borrower agrees to execute any documentation necessary to comply with this Section 28.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
Feysal Ayati-Ghaffari                                    -Borrower

_____

_____ (Seal)
Irana Haghnazari                                          -Borrower

_____ (Seal)          _____ (Seal)
                                       -Borrower                                                 -Borrower

_____ (Seal)          _____ (Seal)
                                       -Borrower                                                 -Borrower

_____ (Seal)          _____ (Seal)
                                       -Borrower                                                 -Borrower

Reviewer ID: Tamar_Belcher_2018-11-07_09:25:29

STATE OF TEXAS
County of _Dallas_

Before me _Tracey A. Stoner_ on this day personally appeared
_Feysal Ayati Ghaffari & Irana Haghnazari_

known to me (or proved to me on the oath of
or through _TX Drivers License_ ) to be the person whose name is subscribed to the
foregoing instrument and acknowledged to me that he/she/they executed the same for the purposes and
consideration therein expressed.

Given under my hand and seal of office this _10th_ day of _November 2008_

(Seal)

TRACEY A. STONER
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 03-15-2009

_[signature]_
Notary Public

My Commission Expires:

VMP®-6A(TX) (0704)                     Page 16 of 16

Initials: _FA_
_I.H_

Form 3044   1/01

# RENEWAL AND EXTENSION RIDER

Loan No:

This Renewal and Extension Rider is incorporated into and shall amend and supplement the Security Instrument of even date herewith. The Note is in renewal and extension, but not in extinguishment, of the indebtedness, whether one or more, described as follows:

Original Note to : T BANK, N.A.
Amount: $155,295.00 on December 21, 2007
Recorded in INSTRUMENT NO. 2008-51540 in COLLIN County, Texas
EXECUTED BY: FEYSAL AYATI-GHAFFARI

Lender is expressly subrogated to all rights, liens, equities and remedies securing the original holder(s) of the above debt(s) and the original lien(s) securing the same are renewed and extended to the date of maturity of the Note secured by the Security Instrument in renewal and extension of the indebtedness. Borrower acknowledges that the lien(s) securing the prior debt(s) is valid, that the lien(s) subsists against the Property, and that by this instrument it is renewed and extended in full force until the Note is paid, even though the original lien(s) is released and not assigned to Lender.

This renewal and extension is not a refinance of a debt any portion of which is an extension of credit as defined by Section 50(a)(6) or Section 50(a)(7), Article XVI, of the Texas Constitution.

In addition to the refinance of principal and any interest, if Lender is advancing all or a portion of the costs necessary to refinance debt on the Property, Borrower acknowledges that these costs are reasonable and necessary costs to refinance such debt.

_Feysal Ayati-Ghaffari_ 11/10/2008    _____ 11/10/2008
Borrower FEYSAL AYATI-GHAFFARI    Date    Borrower IRANA HAGNAZARI    Date

_____    _____    _____    _____
Borrower    Date    Borrower    Date

Renewal and Extension Rider (Texas)
—Black, Mann & Graham, L.L.P.— www.bmandg.com    Page 1 of 1

FA
JH.

Reviewer ID: Tamar_Belcher_2018-11-07_09:25:29

Filed and Recorded
Official Public Records
Stacey Kemp, County Clerk
Collin County, TEXAS
11/19/2008 10:38:47 AM
$84.00 BNOPP
20081119001345840



2014040400032303D   04/04/2014 11:16:53 AM AS   1/1

## CORPORATE ASSIGNMENT OF DEED OF TRUST

Contact **JPMORGAN CHASE BANK, N.A.** for this instrument 780 Kansas Lane, Suite A, Monroe, LA 71203, telephone # (866) 756-8747, which is responsible for receiving payments.

Loan #

**FOR GOOD AND VALUABLE CONSIDERATION**, the sufficiency of which is hereby acknowledged, the undersigned, **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR FREEDOM MORTGAGE CORPORATION, ITS SUCCESSORS AND ASSIGNS, WHOSE ADDRESS IS P.O. BOX 2026, FLINT, MI, 48501-2026**, (ASSIGNOR), by these presents does convey, grant, assign, transfer and set over the described Deed of Trust with all interests secured thereby, all liens, and any rights due or to become due thereon, to **JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, WHOSE ADDRESS IS 700 KANSAS LANE, MC 8000, MONROE, LA 71203 (866)756-8747, ITS SUCCESSORS AND ASSIGNS**, (ASSIGNEE).

Said Deed of Trust in the amount of $163,000.00, bearing the date 11/03/2008, was executed by **FEYSAL AYATI-GHAFFARI AND IRANA HAGHNAZARI** and recorded as Instrument # 20081119001345840, in Book , Page , in the records of Real Property of COLLIN County, Texas.

**IN WITNESS WHEREOF**, this Assignment is executed on _03 / 25 / 2014_ (MM/DD/YYYY).
**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR FREEDOM MORTGAGE CORPORATION, ITS SUCCESSORS AND ASSIGNS**

By: _____

_MICHAEL R. MCELWEE_
**ASST. SECRETARY**

STATE OF LOUISIANA    PARISH OF OUACHITA
On _03 25 2014_ (MM/DD/YYYY), before me appeared _Michael R. McElwee_, to me personally known, who did say that he/she/they is/are the ASST. SECRETARY of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR FREEDOM MORTGAGE CORPORATION, ITS SUCCESSORS AND ASSIGNS and that the instrument was signed on behalf of the corporation (or association), by authority from its board of directors, and that he/she/they acknowledged the instrument to be the free act and deed of the corporation (or association).

_____
TODD C SYLVESTER #062367
Notary Public - State of LOUISIANA
Commission expires: Upon My Death

TODD C SYLVESTER
NOTARY PUBLIC # 062367
OUACHITA PARISH LOUISIANA
MY COMMISSION IS FOR LIFE

Document Prepared By: Robert E. Fletcher - c/o NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152
When Recorded Return To: JPMorgan Chase Bank, NA, C/O Nationwide Title Clearing, Inc. 2100 Alt. 19 North, Palm Harbor, FL 34683
JPCAS          CHASE MIN              MERS PHONE 1-888-679-6377

Filed and Recorded
Official Public Records
Stacey Kemp, County Clerk
Collin County, TEXAS
04/04/2014 11:16:53 AM
$22.00 DFOSTER
2014040400032303D



Reviewer ID: Tamar_Belcher_2018-11-07_09:25:29



Page 1 of 6





| | Customer Service Center | **1-800-848-9136** |
| | Monday - Friday | 8 a.m. - 12 a.m.(ET) |
| | Saturday | 8 a.m. - 8 p.m. (ET) |
| | Hearing Impaired (TDD) | **1-800-582-0542** |

FEYSAL AYATI-GHAFFARI
2301 ALL SAINTS LN
PLANO, TX   75025-5537

## Escrow: Taxes and Insurance Statement

| Loan Number | |
| --- | --- |
| Statement Date | 09/12/2018 |
| Review Period | 05/2018 to 09/2018 |
| **Escrow Shortage** | **$0.00** |

### Important Message

For more information about escrow, visit **chase.com/ManageMyMortgage.**

If you are in bankruptcy or have been given a discharge for your bankruptcy, this letter is for information only. This letter is not an attempt to collect a debt. It is not an attempt to collect, assess or recover all or part of the debt from you. If a bankruptcy trustee is making your payments for you, please give a copy of this statement to the trustee.

Your escrow shortage amount does not include any actual shortage that might have been included before you filed for bankruptcy.

### Monthly Home Loan Payment

| | Current Payment | New Payment Effective 10/01/2018 |
| --- | --- | --- |
| Principal & Interest | $1,070.80 | $1,070.80 |
| Escrow Account Deposit | $0.00 | $700.51 |
| **Total Payment Amount** | **$1,070.80** | **$1,771.31** |

### Summary

**Your escrow account is balanced.**

You have exactly the amount of money in your escrow account needed to pay your estimated property taxes and/or insurance for next year. Keep this statement for your records. You do not need to do anything else.

Your monthly payment will be $1,771.31 starting 10/01/18.

## Balancing Your Escrow Account

There needs to be enough money in your escrow account to pay your property taxes and/or insurance. To do that, federal law allows us to require that you keep a minimum balance in your account. This cash reserve helps to cover any increase in taxes and/or insurance. However, the minimum balance requirement has been waived for your account.

The payments made to and from your escrow account last year help predict your account activity for next year. This year's activity also helps predict what your lowest account balance is likely to be.[1]

To balance your escrow account, we compare what your lowest account balance will likely be next year with your minimum required balance. If there is no difference between the numbers, your escrow account is balanced.

| | |
|---|---|
| $0.00 | Your minimum required balance |
| S-37,160.53 | Your estimated lowest account balance for 2019[1] |
| **$0.00** | **Your escrow account is balanced** |

[1]See the "Estimated Escrow Account Activity" chart in this statement.

## Escrow Account History

The chart below compares this year's activity on your escrow account with our estimates. The estimated amounts came from your last escrow account review.

- Your most recent mortgage payment due was $1,070.80. Your mortgage payment includes principal and interest $1,070.80 and escrow money $0.00.
- At the time of your last escrow account review, your expected lowest balance was $0.00. The chart below shows that your actual lowest escrow balance was $-31,557.05.

Note: changes in property taxes or insurance premiums create the difference between the estimated and actual amounts in the chart. An "E" in the chart below means expected activity that hasn't occurred yet.

*Indicates a difference between the estimated and actual amounts.

### This Year: May 2018 to September 2018

| Date | Activity | | Estimated Amount | Actual Amount | | Estimated Escrow Balance | Actual Escrow Balance |
|---|---|---|---|---|---|---|---|
| | Starting Balance | | | | | $2,101.45 | $-31,557.05 |
| 05/2018 | Deposit | | $700.51 | $0.00 | * | $2,801.96 | $-31,557.05 |
| 06/2018 | Deposit | | $700.51 | $0.00 | * | $3,502.47 | $-31,557.05 |
| 07/2018 | Deposit | | $700.51 | $0.00 | * | $4,202.98 | $-31,557.05 |
| 08/2018 | Deposit | | $700.51 | $0.00 | * | $4,903.49 | $-31,557.05 |
| 09/2018 | Deposit | | $700.51 | $0.52 | E | $5,604.00 | $-31,556.53 |
| 10/2018 | Deposit | | $700.51 | $0.00 | * | $6,304.51 | $0.00 |
| 11/2018 | Deposit | | $700.51 | $0.00 | * | $7,005.02 | $0.00 |
| 12/2018 | Deposit | | $700.51 | $0.00 | * | | |
| | Withdrawal - COUNTY TAX | | $6,127.04 | $0.00 | * | $1,578.49 | $0.00 |
| 01/2019 | Deposit | | $700.51 | $0.00 | * | | |
| | Withdrawal - HOMEOWNER IN | | $2,279.00 | $0.00 | * | $0.00 | $0.00 |
| 02/2019 | Deposit | | $700.51 | $0.00 | * | $700.51 | $0.00 |

**(Continued)**

Reviewer ID: Tamar_Belcher_2018-11-07_09:25:29

 Page 3 of 6



Escrow: Taxes and Insurance Statement

| Loan Number | |
|---|---|
| Statement Date | 09/12/2018 |
| Review Period | 05/2018 to 09/2018 |
| **Escrow Shortage** | **$0.00** |

FEYSAL AYATI-GHAFFARI
2301 ALL SAINTS LN
PLANO, TX  75025-5537

## This Year: May 2018 to September 2018 (continued)

| Date | Activity | Estimated Amount | Actual Amount | Estimated Escrow Balance | Actual Escrow Balance |
|---|---|---|---|---|---|
| 03/2019 | Deposit | $700.51 | $0.00 * | $1,401.02 | $0.00 |
| 04/2019 | Deposit | $700.51 | $0.00 * | $2,101.53 | $0.00 |
| | Total Deposits | $8,406.12 | $0.52 | | |
| | Total Withdrawals | $8,406.04 | $0.00 | | |
| | Account Balance as of 09/2018 | | | | $-31,556.53 |

## Expected Escrow Account Activity

The chart below estimates your escrow account balance for the next 12 months with your new monthly escrow account deposit of $700.51 and any anticipated withdrawals. The chart shows that you will reach your estimated lowest account balance of $-37,160.53 in January 2019 (highlighted below). That is equal to your minimum required balance of $0.00.

### Next Year: October 2018 to September 2019

| Date | Activity | Estimated Amount | Actual Amount | Estimated Escrow Balance | Actual Escrow Balance |
|---|---|---|---|---|---|
| | Starting Balance | | | | $-31,556.53 |
| 10/2018 | Deposit | $700.51 | | $-30,856.02 | |
| 11/2018 | Deposit | $700.51 | | $-30,155.51 | |
| 12/2018 | Deposit Withdrawal - COUNTY TAX | $700.51 $6,127.04 | | $-35,582.04 | |
| 01/2019 | Deposit Withdrawal - HOMEOWNER IN | $700.51 $2,279.00 | | $-37,160.53 | |
| 02/2019 | Deposit | $700.51 | | $-36,460.02 | |
| 03/2019 | Deposit | $700.51 | | $-35,759.51 | |
| 04/2019 | Deposit | $700.51 | | $-35,059.00 | |
| 05/2019 | Deposit | $700.51 | | $-34,358.49 | |
| 06/2019 | Deposit | $700.51 | | $-33,657.98 | |
| 07/2019 | Deposit | $700.51 | | $-32,957.47 | |
| 08/2019 | Deposit | $700.51 | | $-32,256.96 | |
| 09/2019 | Deposit | $700.51 | | $-31,556.45 | |
| | Total Estimated Deposits | $8,406.12 | | | |
| | Total Estimated Withdrawals | $8,406.04 | | | |
| | Estimated Account Balance as of September 2019 | | | $-31,556.45 | |

## Expected Escrow Account Payments

This section reflects the escrow activity that is expected to occur in the next 12 months. The 'Total Tax and Insurance Monthly Payment Amount' at the bottom of this chart is your new monthly escrow deposit, as listed on page 1 of this statement.

| Tax | | | Insurance | | |
|---|---|---|---|---|---|
| Item | Annual Expense | Anticipated Date(s) of Payment | Item | Annual Expense | Anticipated Date(s) of Payment |
| COUNTY TAX | $6,127.04 | December 18 | HOMEOWNER IN | $2,279.00 | January 19 |

**Total Tax and Insurance Monthly Payment Amount = $700.51**

Reviewer ID: Tamar_Belcher_2018-11-07_09:25:29

This Page Intentionally Left Blank

Reviewer ID: Tamar_Belcher_2018-11-07_09:25:29





A QUICK GUIDE TO UNDERSTANDING YOUR

# Annual Escrow Analysis



**Current Monthly Mortgage Payment**

**New Monthly Mortgage Payment**

**Escrow Account Summary**

This section shows: If your escrow account is balanced, or if it has a surplus or a shortage. If you have a shortage, it explains your options to pay the difference. If you have a surplus of more than $50, your refund check is attached.

**Escrow Shortage Coupon or Surplus Check**

If you have a shortage, you can use this coupon to mail a full or partial payment of your escrow shortage. You can also pay all or part of your shortage at chase.com. If you have a surplus, your surplus check will be attached here. Please detach and cash it.

**Escrow Account History**

The activity for your escrow account from the past year is shown here, along with what we estimated your payments would be.

**Expected Escrow Activity for Next Year**

We've calculated what we expect your escrow account balance will be for the upcoming year, based on your current tax and insurance expenses. However, your account could have a shortage or a surplus at the end of the upcoming year, if your tax and/or insurance costs change.

**Expected Escrow Payment for Next Year**

These are the tax and/or insurance amounts we expect to pay in the next 12 months, and when we expect to pay them. If you believe information is missing or incorrect, please call us at 1-800-848-9136.

Reviewer ID: Tamar_Belcher_2018-11-07_09:25:29



## FREQUENTLY ASKED QUESTIONS

**Why am I getting an Escrow Analysis?**

We run your Escrow Analysis annually so you know the amount of taxes and/or insurance we paid for you this past year with funds from your escrow account. We also include what we expect to pay next year.

**How is my monthly escrow payment calculated?**

Each year, we project how much you'll need in your escrow account to pay your taxes and/or insurance for the upcoming year, based on your taxes and/or insurance at the time of your Escrow Analysis. You pay a portion of the total projected escrow amount each month with your mortgage payment. We then use those escrow funds to pay your taxes and/or insurance on your behalf.

If your taxes and/or insurance change during the next 12 months, you could have a shortage or surplus in your account when we run next year's analysis.

**What is an escrow minimum balance?**

For most accounts, the minimum required balance is equal to two months of escrow payments. This minimum balance helps cover any increases in your taxes and/or insurance over the next year.

## ESCROW RESOURCES

- View your annual Escrow Analysis online to see if your monthly mortgage payment is changing due to an increase or decrease in your property taxes and/or insurance at **chase.com/EscrowAnalysis.**

- For answers to more questions and to watch our informational video, visit **chase.com/Escrow.**

- To stay informed about activity from your escrow account throughout the year, sign up for free escrow alerts at **chase.com/Alerts.**

 ©2015 JPMorgan Chase & Co.

Reviewer ID: Tamar_Belcher_2018-11-07_09:25:29